# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01829-SBP

EDWARD NKUGWA KIRONDE NALWAMBA,

      Petitioner,

v.

JUAN BALTAZAR, Warden of the Denver Contract Detention Facility, Aurora, Colorado, in his official capacity,
GEORGE VALDEZ,[1] Field Office Director, Denver Field Office, U.S. Immigration and Customs Enforcement, in his official capacity,
MARKWAYNE MULLIN,
DAVID J. VENTURELLA, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement, in his official capacity, and
TODD BLANCHE, Acting Attorney General, U.S. Department of Justice, in his official capacity,

      Respondents.

---

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

**Susan Prose, United States Magistrate Judge**

      This matter is before the court on Edward Nkugwa Kironde Nalwamba ("Petitioner")'s Petition for Writ of Habeas Corpus. ECF No. 1 ("Petition"). The parties have consented to proceed before the undersigned United States Magistrate Judge, ECF No. 7, and this court thus has the authority to grant habeas relief if Petitioner demonstrates that his custody violates the Constitution, laws, or treaties of the United States under 28 U.S.C. § 2241(c)(3). *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) ("*Zadvydas*") (recognizing that federal courts have jurisdiction

---

[1] George Valdez and David J. Venturella are substituted as respondents here pursuant to Federal Rule of Civil Procedure 25(d).

over constitutional challenges to the detention of noncitizens).[2] In making its determination, the court has considered all briefing on the Petition, *see* ECF Nos. 1, 9, 12, 13, 19, and 20[3], and the entire docket.

Because Respondents have demonstrated that there is a significant likelihood of Petitioner's removal in the reasonably foreseeable future—Petitioner is set to be removed to his native Uganda seven days from now on June 30, 2026—and because Petitioner has received the process he is due as a prelude to his removal, the Petition is respectfully **DENIED without prejudice**.

**BACKGROUND**

The following facts from the decades-long history of Petitioner's immigration removal proceedings bear on the court's decision.

---

[2] The "REAL ID Act" of 2005, *see* Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005), divests federal courts of jurisdiction over several categories of immigration proceedings, including a habeas petition challenging a final order of removal. *Thoung v. United States*, 913 F.3d 999, 1003 (10th Cir. 2019) ("The REAL ID Act expressly divests district courts of jurisdiction over habeas challenges to removal orders, . . . and funnels all such challenges to the 'appropriate court of appeals' as the 'sole and exclusive means for judicial review of an order of removal[.]'") (quoting 8 U.S.C. § 1252(a)(5)); *see also Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1278 (10th Cir. 2018) ("Congress clearly intended to funnel all challenges to removal through the petition for review process."). Recognizing this, on June 18, 2026, this court exercised its discretion to vacate its April 30, 2026 order (ECF No. 4) that had sought to enjoin Respondents from transferring Petitioner outside of the jurisdiction of the District of Colorado pending resolution of the Petition. ECF No. 15.

[3] Following the oral argument on June 22, 2026, the court gave Petitioner an opportunity to bolster his record by means of supplemental briefing and Respondents an opportunity to respond to that supplement. Both parties submitted supplemental briefing, *see* ECF Nos. 19, 20, which the undersigned has considered in evaluating the Petition.

### A.      History of Petitioner's Presence in the United States

Petitioner is a native and citizen of Uganda. ECF No. 9-1 ¶ 4; ECF No. 20-1 ¶ 4.[4] More than twenty-four years ago—on January 2, 2002—Petitioner, who is a pastor, was admitted to the United States on a nonimmigrant visa to attend a religious conference. ECF No. 1 ¶ 17. Instead of returning to his home country after the conference, Petitioner overstayed the authorized period of stay under his visa. ECF No. 9-1 ¶ 5.

On March 11, 2004, the United States Department of Homeland Security ("DHS") issued a Notice to Appear ("NTA"), initiating removal proceedings under 8 U.S.C. § 1229a before the Executive Office for Immigration Review ("EOIR"). ECF No. 9-1 ¶ 6. The NTA charged Petitioner with being removable from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B), as an alien present in the United States in violation of the Immigration and Nationality Act ("INA"). *Id.* ¶ 9.

On October 24, 2005, Petitioner failed to appear for a hearing before the immigration court, prompting an immigration judge ("IJ") to order his removal from the United States in absentia pursuant to 8 U.S.C. § 1229a(b)(5). *Id.* ¶ 7. On November 9, 2005, Petitioner filed a motion with the EOIR to reopen removal proceedings. *Id.* ¶ 8. The IJ denied that motion on November 28, 2005, but Petitioner appealed to the Board of Immigration Appeals ("BIA"). *Id.* ¶¶ 8-9. The BIA rescinded the removal order and remanded the case to the IJ on June 6, 2006. *Id.*

---

[4] The declaration of a deportation officer with Immigration and Customs Enforcement ("ICE") docketed at ECF No. 20-1 was presented in connection with the supplemental briefing authorized by the court on June 22, 2026. The contents of that declaration are substantively duplicative of those set forth in an earlier declaration docketed at ECF No. 9-1 except where otherwise noted here.

¶ 9. On July 19, 2006, Petitioner filed a Form I-589, which is an "Application for Asylum and for Withholding of Removal," with the EOIR. *Id.* ¶ 10.

At a hearing on March 2, 2007, the IJ evaluated the merits of Petitioner's application. *Id.* ¶ 11. At that hearing, Petitioner "testified that he was an ordained priest who had publicly condemned human rights abuses committed by the Ugandan government," focusing on events that occurred under the tenure of Ugandan President Yoweri Mseveni, who took office in 1986. *See Nalwamba v. Holder*, 375 F. App'x 859, 861 (10th Cir. 2010). The IJ denied petitioner's Form I-589, but granted what Respondents describe as a "Voluntary Departure with an alternate order of removal to Uganda." ECF No. 9-1 ¶ 11. Petitioner appealed that decision, but the BIA dismissed that appeal on November 18, 2008. *Id.* ¶ 13. Under the BIA's order, Petitioner was allowed 60 days to voluntarily department from the United States; if Petitioner failed to depart, then the Voluntary Departure order would convert to an order of removal. *Id.* Petitioner filed a motion to reopen the proceeding with the BIA on May 1, 2009, which the BIA denied on June 2, 2009. *Id.* ¶ 14.

Petitioner then sought review in the United States Court of Appeals for the Tenth Circuit, which found that it had jurisdiction to consider three claims: "(A) whether the BIA erred in affirming the IJ's decision that [Petitioner's] mistreatment during the Museveni regime constituted harassment instead of persecution; (B) whether the BIA erred in affirming the IJ's decision that conditions have improved in Uganda; and (C) whether the BIA erred in affirming the IJ's decision that Mr. Nalwamba failed to demonstrate that he is likely to be tortured if removed to Uganda." *Nalwamba*, 375 F. App'x at 863. The Court of Appeals denied each claim on the merits. *See id.* Specifically, the Court found that (1) "the threats against [Petitioner] could

4

be viewed as not so 'immediate and menacing' as to constitute persecution," *id.* at 864 (citing *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003)); (2) that the BIA properly rejected Petitioner's claim of future prosecution because he "failed to establish the past persecution that would create a rebuttable presumption of future persecution and place the burden on the DHS to prove changed conditions," *id.*; and (3) Petitioner failed to establish that he was entitled to relief under the Convention Against Torture, *id.* at 865.

After the Tenth Circuit issued its decision on April 8, 2010, Petitioner's removal order became final. *See* 8 U.S.C. § 1231(a)(1)(B)(ii) ("The removal period begins on the latest of the following: . . . [i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order."); ECF No. 9-1 ¶ 15. Petitioner still did not leave the United States. ICE officers arrested and detained Petitioner on November 17, 2010, in order to effectuate his removal from the United States. ECF No. 9-1 ¶ 16. While Petitioner was detained, ICE officials served him a Form I-229(a), a "Warning for Failure to Depart," on multiple occasions, *id.* ¶¶ 17-23, but he continually refused to complete a "travel document application." *Id.* ¶¶ 18, 20, 21; *see also id.* ¶ 22 (averring that "[i]n June 29, 2011, ICE again served petitioner a Form I-229(a)," but he "again advised that he would not complete a travel document application nor would he speak with the officials from the Ugandan consulate").

On August 2, 2011, ICE conducted a Post Order Custody review pursuant to 8 C.F.R. § 241.4 and determined that it would release Petitioner on an order of supervision, or "OSUP." *Id.* ¶¶ 24-25. That supervision apparently proceeded without incident for some fourteen years. On August 27, 2025, Petitioner enrolled in ICE's "Alternatives to Detention," or "ATD," program. *Id.* ¶ 26. Approximately three weeks later, on September 18, 2025, ICE officers

encountered Petitioner in Denver, Colorado, and "determined that [he] is subject to a final order of removal." *Id.* ¶ 27. At that time, Petitioner's "release on supervision was revoked and his enrollment in ATD was terminated . . . pursuant to 8 C.F.R. § 241.4(i)(2)[5] because ICE determined that it was appropriate to enforce the removal order." *Id.* Since September 18, 2025, Petitioner has been detained at the Denver Contract Detention Facility in Aurora, Colorado, pursuant to 8 U.S.C. § 1231, which governs the detention and removal of aliens who are ordered removed.

### B.    Petitioner's Imminently-Scheduled Removal to Uganda

On December 9, 2025, ICE conducted a personal interview with Petitioner, who was given the opportunity to make a statement and provide documentation relevant to his custody review. *See* ECF No. 9-1 ¶ 32; *see also* ECF No. 20 at 6. At the conclusion of that interview, an ICE review panel recommended that Petitioner remain in custody pending removal because he did not satisfy the criteria for release under 8 C.F.R. § 241.4(e). *Id.*; *see also* 8 C.F.R. § 241.4(e) ("Before making any recommendation or decision to release a detainee, a majority of the Review Panel members, or the Director of the HQPDU in the case of a record review, must conclude that: (1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest; (2) The detainee is presently a non-violent person; (3) The detainee is likely to remain nonviolent if released; (4) The detainee is not likely to pose a threat to the community following release;

---

[5] "Initially, and at the beginning of each subsequent review, the [Headquarters Post-Order Detention Unit] or a Review Panel shall review the alien's records. Upon completion of this records review, the HQPDU Director or the Review Panel may issue a written recommendation that the alien be released and reasons therefore." 8 C.F.R. 241.4(i)(2).

(5) The detainee is not likely to violate the conditions of release; *and* (6) The detainee does not pose a significant flight risk if released.") (emphasis added). In ICE's view, its determination that Petitioner failed to satisfy the criteria under § 241.4(e) "also meant that revocation [of the OSUP] was warranted." ECF No. 9-1 ¶ 32 (stating that 8 C.F.R. § 241.4(*l*)(3) was satisfied by this determination).

By mid-December 2025, ICE determined that no charter flights were scheduled for Uganda, which prompted the initiation of "the process of preparing a travel document request for Petitioner." *Id.* ¶ 33. A completed travel document package was submitted for Petitioner on February 3, 2026, to allow him to be removed via commercial flight to Uganda. *Id.*

This is where things stood on May 11, 2026, when the government responded to the Petition. But recent developments have solidified Petitioner's departure date. On June 15, 2026, Respondents submitted sworn testimony from an ICE official stating that Petitioner was set to be removed to Uganda "on or about June 25, 2026," ECF No. 13-1 ¶ 7, following the elimination of certain procedural barriers to his departure:

> Uganda is listed in the U.S. Electronic Nationality Verification program, which allows for electronic verification of nationality, without the need for a physical travel document. On or about May 17, 2026, an ICE attaché confirmed with the government of Uganda that Petitioner is a citizen of Uganda. Consequently, Petitioner can travel to Uganda by means of a Form I-269, Certificate of Identify for Departure from the United States, in place of a travel document issued by the government of Uganda.

*Id.* ¶ 6; ECF No. 20-1 ¶ 6. At that time, ICE was "working on finalizing Petitioner's travel itinerary with an anticipated removal on or about June 25, 2026." ECF No. 9-1 ¶ 7. Respondents have since informed the court, in connection with their supplemental briefing, that Petitioner's departure date is slightly delayed. As an ICE official explains, "[d]ue to the complexity of the

finalization of [Petitioner's travel] plans, ICE now believes that Petitioner's removal to Uganda will take place on or about June 30, 2026. (Petitioner will first be flown from Denver to another city in the United States on June 29, 2026.)." ECF No. 20-1 ¶ 7.

### ANALYSIS

Petitioner contends that *Zadvydas* compels his release because he has been detained for more than 180 days since September 18, 2025, "and there is no significant likelihood that [ICE] will be able to deport him in the reasonably foreseeable future"—making his continued detention "unreasonable and unlawful." ECF No. 1 ¶¶ 29-30. Petitioner further argues that his purportedly "unreviewed incarceration"—caused by ICE's revocation of his OSUP in alleged violation of the regulatory provisions governing revocation of release, *see* ECF No. 1 ¶ 21—amounts to a due process violation. *Id.* ¶ 32. Respondents disagree. They argue, first, that Petitioner's removal *is* reasonably foreseeable (it will be accomplished in just seven days), and second, that all applicable procedural requirements associated with his detention have been satisfied. ECF No. 9 at 5-13.

The undisputed factual record here, viewed pursuant to the governing legal principles, compels the court to agree with Respondents, on both points.

### A.    *Zadvydas* Issue

Section 2241 of Title 28 authorizes a court to issue a writ of habeas corpus when a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus proceedings under 28 U.S.C. § 2241 "remain available as a forum for statutory and constitutional challenges to post-removal-period detention." *Singh v. Choate*, No. 23-cv-02069-CNS, 2024 WL 309747, at *1 (D. Colo. Jan. 26, 2024) (quoting *Zadvydas*, 533

U.S. at 688); *see also Hernandez-Ceren v. Wolf*, No. 20-cv-01628-RM, 2020 WL 3036074, at *1 (D. Colo. June 6, 2020) ("[A] person subject to removal is in custody for habeas purposes."). The writ of habeas corpus is designed to challenge "the fact or duration" of a person's confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). "In other words, habeas corpus, and thus § 2241, offers detainees release from custody when the very fact that they are detained, or detained for a certain length of time, is unlawful." *Codner v. Choate*, No. 20-cv-01050-PAB, 2020 WL 2769938, at *4 (D. Colo. May 27, 2020).

Two sections of the INA authorize detention: 8 U.S.C. § 1226, which concerns noncitizens who are not yet subject to a removal order, and 8 U.S.C. § 1231, which operates in the post-removal context. Petitioner, who is subject to a removal order, is detained pursuant to § 1231. Under § 1231, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days[.]" 8 U.S.C. § 1231(a)(1). The noncitizen must be detained during this initial 90-day timeframe, *see* § 1231(a)(2), which is "referred to as the 'removal period.'" 8 U.S.C. § 1231(a)(1)(A). If the noncitizen "does not leave or is not removed within the removal period," then he or she is normally subject to supervised release. 8 U.S.C. § 1231(a)(3). However, certain categories of noncitizens who have been ordered removed—including inadmissible or criminal noncitizens, or noncitizens whom the Attorney General has determined are a risk to the community or are unlikely to comply with the removal order—"may be detained beyond the removal period[.]" 8 U.S.C § 1231(a)(6). The text of the INA does not contain an express limit on the duration a noncitizen may be detained under its authority.

In *Zadvydas*, the Supreme Court held that § 1231(a)(6) "does not permit indefinite detention," although the statute does not specify a time limit on how long DHS may detain a noncitizen in the post-removal period. *See* 533 U.S. at 689. Rather, "in light of the Constitution's demands," a noncitizen may be detained only for "a period reasonably necessary to bring about that alien's removal from the United States." *Id.*; *accord Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579 (2022). The Supreme Court explained that "Congress previously doubted the constitutionality of detention for more than six months" and recognized six months as presumptively reasonable. *Zadvydas*, 533 U.S. at 701. Importantly, however, "under *Zadvydas*, expiration of the presumptively reasonable six-month detention period does not mandate a noncitizen's release; detention may continue 'until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.'" *Aguilar v. Noem*, No. 25-cv-03463-NYW, 2025 WL 3514282, at *3 (D. Colo. Dec. 8, 2025) (quoting *Zadvydas*, 533 U.S. at 701). "Expiration of the six-month period simply requires the Government to rebut a petitioner's showing that 'there is no significant likelihood of removal in the reasonably foreseeable future,' assuming the petitioner makes that showing." *Id.* (quoting *Zadvydas*, 533 U.S. at 701).

Applying these principles to the case at hand, Petitioner's nine-month confinement since September 2025 certainly exceeds the presumptively reasonable six-month period of detention. However, the court finds that Petitioner has failed to meet his burden to show that removal is not significantly likely in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701. Quite the opposite: he has come forward with *no* substantive evidence providing a good reason to believe a significant likelihood of removal is lacking, in view of the government's strong factual

presentation to the contrary. The government's evidentiary record, consisting of sworn testimony from ICE officials, bolstered by the representation of an Assistant United States Attorney, is that Petitioner's departure from the United States is slated to be accomplished by means of a commercial flight within seven days of the date of issuance of this order—a process unhindered by the necessity to obtain formal travel documents. In light of this record, the court cannot countenance Petitioner's contention that Respondents "have provided no evidence whatsoever in support" of his imminent removal. *See* ECF No. 19 at 9. Furthermore, this situation is markedly unlike the one in which Judge Brimmer of this Court concluded that the government respondents had failed to rebut the petitioner's showing as to the likelihood of his removal. *See* ECF No. 19 at 9-10 (discussing *Pena-Gil v. Lyons*, No. 25-cv-03268-PAB-NRN, 2025 WL 3268333 (D. Colo. Nov. 24, 2025)). In *Pena-Gil* far less certainty attended the government's removal efforts because an ICE official was unable to say more than that "ICE continues to pursue Petitioner's deportation by nominating him for deportation to Cuba and has pursued that process through the Cuban government. The process is still pending adjudication." *Id.* at *4.

Here, by contrast, the process is neither "pending adjudication," nor is there uncertainty concerning the government's ability to remove Petitioner to his home country of Uganda. The record demonstrates no reason for the court to doubt the government's evidentiary representations, and this is so notwithstanding the assertions of Petitioner's counsel that they believe only Honduras, Guatemala, and Peru participate in the U.S. Electronic Nationality Verification program and that "[n]o reference to Uganda's participation in ENV was uncovered in counsel's research." ECF No. 16 at 3 (citing https://www.americanimmigrationcouncil.org/fact-sheet/electronic-nationality verification-

program-overview/). The American Immigration Council, a nonprofit organization obviously unaffiliated with the Department of Homeland Security, is not necessarily in a position to know the full scope of participants in the program, and the status of participating nations "[a]s of 2025" does not by definition reflect the state of affairs in June 2026. *See* The Electronic Nationality Verification Program: An Overview - American Immigration Council, last visited June 23, 2026. At this juncture, the government has represented to this court that Uganda is a participant is the program and that Petitioner's departure for that country is just days away. And as the court observed at the oral argument on the Petition, it is not obliged to require the Secretary of the Department of Homeland Security to explain the particulars of the removal procedures to Petitioner's satisfaction; it is enough that the government has represented, in sworn testimony, that Petitioner's removal is scheduled to occur in seven days' time. Put another way, Respondents have affirmatively furnished evidence sufficient to rebut Petitioner's showing (generously assuming that he has succeeded in making some sort of showing), which reflects Petitioner's failure to demonstrate no significant likelihood of removal in the reasonably foreseeable future. *See Zadvydas*, 533 U.S. at 701.

The court is unpersuaded to reach a different conclusion by Petitioner's argument that the presumptively reasonable six-month period in fact expired years ago, in February 2011, ECF No. 19 at 3—ninety days after Petitioner's arrest in November 2010 following his failure to depart the United States after the Tenth Circuit's disposition of his case on April 8, 2010. Petitioner cites no legal authority for this proposition. Regardless, the court already has found that Petitioner has met his burden to show that the period of his incarceration following the revocation of his OSUP is constitutionally unreasonable, and so the period of his previous

detention adds nothing to that conclusion. The pertinent issue here is whether Petitioner has shown that he is entitled to a shield from detention pending his removal because there is no significant likelihood of removal in the reasonably foreseeable future.[6] For the reasons explained in this order, he has not made that showing.[7]

In sum, the court finds that Petitioner's detention is not unreasonable under *Zadvydas* because the record evidence shows that there is a significant likelihood that his removal is reasonably foreseeable. He is therefore not entitled to pre-removal release from detention under *Zadvydas*.

**B.      Due Process Issue Attendant Upon Revocation of the Order of Supervision**

Petitioner next argues that he must be released because ICE's revocation of his OSUP on September 18, 2025, ran afoul of the regulatory provisions governing revocation of release. As he puts it, "ICE failed to comply with the procedural due process requirements which must be satisfied at the time of revocation of release." ECF No. 1 ¶ 21. Specifically, per Petitioner, he "was not notified of the reasons of the revocation of his release," and "[h]e was also not afforded

---

[6] Petitioner argues that Respondents concede that he is not a flight risk, ECF No. 19 at 3, a point Respondents vigorously dispute. As they put it, Petitioner's "flight risk is now at its peak" because "his legal means for remaining in the country have been exhausted and he has been told that he will be removed in days." ECF No. 20 at 2-3. While the latter proposition may be characterized as a matter of common sense, the court need not make a finding either way concerning Petitioner's risk of flight. The court's focus is on whether there is a significant likelihood of removal in the reasonably foreseeable future, and the record here shows that there is.

[7] The court is denying the Petition without prejudice because Respondents have now changed the date of Petitioner's deportation, even if only by a few days. If, contrary to the representations to which the government has attested before this court, Petitioner is not removed from the United States at the anticipated time and remains detained, his detention may ripen into a meritorious habeas petition. At this time, it has not.

an initial informal interview promptly after his return to custody to afford him an opportunity to respond to the reasons for his revocation." ECF No. 1 ¶ 21 (citing 8 C.F.R. § 241.13(i)); *see also id.* ¶ 32 ("ICE failed to provide Mr. Nalwamba with meaningful due process upon the revocation of his release, in violation of the requirements of 8 CFR 241.13, thereby depriving him of his protected interest in his continued liberty."). Petitioner expands on the due process argument in his supplemental brief, asserting for the first time that "[t]here is no evidence in the instant case that the appropriate ICE official revoked Petitioner's order of supervision or made findings in support thereof." ECF No. 19 at 5.

Respondents dub Petitioner's arguments "unavailing," pointing to several purported flaws in the due process analysis. ECF No. 9 at 8-9. With regard to Petitioner's procedural due process claim, the law again compels the court to agree with the government's analysis.

First, as Respondents accurately note, *see id.* at 9, the legal basis for the revocation of Petitioner's OSUP was 8 C.F.R. § 241.4, which establishes the procedures governing revocation of release for violation of the conditions of an OSUP, and not 8 C.F.R. § 241.13, which applies only "where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future."[8] Pursuant to 8 C.F.R § 241.4(*l*)(2):

> The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the

---

[8] As discussed above, Respondents have provided evidence supporting this court's conclusion that there is a significant likelihood of Petitioner's removal to Uganda in the reasonably foreseeable future.

14

case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i) The purposes of release have been served;

(ii) The alien violates any condition of release;

(iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or

(iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

Respondents state that subsection (iii) of § 241.4(*l*)(2) is the basis for the decision to revoke Petitioner's release on supervision, *see* ECF No. 9-1 ¶ 27, and they further assert that this court lacks jurisdiction to evaluate the merits of that discretionary determination. *See* ECF No. 9 at 9 n.2 (citing 8 U.S.C. §§ 1252(a)(2)(B)(ii), (g)). The court agrees that § 1252 deprives the court of jurisdiction to hear claims arising from the Attorney General's decision to execute removal orders, and the decision to revoke Petitioner's OSUP here—for the stated purpose of enforcing his final order of removal—"clearly falls under the purview of § 1252(g)." *See Barrios v. Ripa*, No. 1:25-cv-22644, 2025 WL 2280485, at *4 (S.D. Fla. Aug. 8, 2025); *see al*so 8 C.F.R. 1252(g) ("**EXCLUSIVE JURISDICTION.** Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."). And "because the Attorney General has the discretion to revoke an OSUP, § 1252(a)(2)(B)(ii) also bars review of that decision." *Barrios*,

15

2025 WL 2280485, at *4.[9]

Turning then to the question over which the court does have jurisdiction, whether Respondents offended Petitioner's due process rights by failing to comply with their own OSUP revocation procedures, the court finds no basis in the record to conclude that Respondents violated these procedures. Recall that Petitioner argues that he "was not notified of the reasons of the revocation of his release," and "[h]e was also not afforded an initial informal interview promptly after his return to custody to afford him an opportunity to respond to the reasons for his revocation." ECF No. 1 ¶¶ 21, 32. Further, he now claims that "[t]here is no evidence in the instant case that the appropriate ICE official revoked Petitioner's order of supervision or made findings in support thereof." ECF No. 19 at 5. Petitioner has not established that the applicable procedural requirements set forth in 8 C.F.R. § 241.4 were not followed in this case.

First, Petitioner was not entitled to notice or an informal interview under § 241.4, but he received notice and an opportunity to be heard nevertheless.

Respondents revoked Petitioner's OSUP to effectuate his removal pursuant to § 241.4(l)(2)(iii). Notably, notice and interview requirements are only referenced in § 241.4(l)(1)—the OSUP revocation provision based on an alien's violation of his conditions of

---

[9] "Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title." 8 C.F.R. 1252(a)(2)(B)(ii).

16

release—but not in § 241.4(*l*)(2)—the OSUP revocation provision based on the discretion of a qualified official to enforce a removal order or to commence removal proceedings. Given this fundamental distinction between the two statutory provisions, the court finds that the alleged lack of notice and opportunity to be heard regarding the revocation of Petitioner's OSUP would not have violated his due process rights. *See Rodriguez v. Baltasar*, No. 26-cv-00686-RMR, 2026 WL 1618516, at *3 (D. Colo. June 5, 2026).

Even so, the record here provides undisputed confirmation that ICE did provide Petitioner the process delineated in § 241(*l*)(3), which provides for a review of the revocation of supervised release based on an interview and review of the records which "will ordinarily be expected to occur within approximately three months after release is revoked. That custody review will include a final evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." 8 C.F.R. § 241.4(*l*)(3). ICE detained Petitioner on September 18, 2025, and on December 9, 2025 (within three months of his detention), conducted a personal interview of him, during which he "was given the opportunity to make a statement and provide documentation relevant to his custody review." ECF No. 9-1 ¶ 32.

Second, the vague assertion that the government has somehow failed to show that "the appropriate ICE official revoked Petitioner's order of supervision," ECF No. 19 at 5, demonstrates no procedural defect of constitutional magnitude. Here, the government has presented evidence that "an ICE review panel recommended that Petitioner remain in custody pending removal," ECF No. 9-1 ¶ 32, which is consistent with the requirements of the regulation. *See* 8 C.F.R. § 241.4(i)(5) ("Following completion of the interview and its deliberations, the

17

Review Panel shall issue a written recommendation that the alien be released or remain in custody pending removal or further review. This written recommendation shall include a brief statement of the factors that the Review Panel deems material to its recommendation."). And it is clear from the regulation that these Panel recommendations are made for the express purpose of informing "[d]eterminations by the Executive Associate Commissioner to release or retain custody of aliens[,]" 8 C.F.R. § 241.4(i)—an official Petitioner seems to acknowledge to be an appropriate deciding authority. *See* ECF No. 19 at 5 (listing "Executive Associate [Director]" as a person with an authority).

On this record, then, Petitioner's assertion that the correct official did not revoke his OSUP rests entirely on speculation; he fails to provide this court with any specific information that there was a flaw in the process in this regard. Given this omission on Petitioner's part, this court is unpersuaded by his argument that an unauthorized party revoked his OSUP. *See Rodriguez*, 2026 WL 1618516, at *4.

Finally, it bears noting that the record here stands in contrast to those cases Petitioner cites, *see* ECF No. 19 at 8-9, all of which reflect a finding by the court (or a concession by the government) of procedural defects that are not discernible in the instant record. *See Medykowski v. Baltazar*, No. 26-cv-01986-SKC, 2026 WL 1532897, at *2 (D. Colo. June 1, 2026) (finding "no dispute that ICE failed to comply with the regulations [in § 241.4] governing the revocation of Petitioner's OSUP, where "Respondents do not refute Petitioner's contentions regarding ICE's failure to follow these procedures") (collecting cases where procedural deficiencies were similarly noted)). That is not the case here.[10]

_____

[10] Because the court finds that no due process violation has occurred, it need not address whether

18

In sum, the court finds that Respondents have not detained Petitioner in violation of his due process rights.

## CONCLUSION

Consistent with the foregoing analysis, Petitioner Edward Nkugwa Kironde Nalwamba's Petition for Writ of Habeas Corpus, ECF No. 1, is respectfully **DENIED without prejudice**. The Clerk of Court is directed to enter judgment in this matter and close this case.

DATED: June 23, 2026                                BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

the appropriate remedy for such a violation would have been Petitioner's release from custody—a point of dispute between the parties. *See* ECF No. 19 at 8-9; ECF No. 20 at 5-6.